UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| ANNA BEER, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 06-473 (RCL) |
| THE ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This action arises from the June 11, 2003 suicide bombing of a bus in Jerusalem, Israel. Plaintiffs are the mother, brother, and sisters of Alan Beer, who was killed in the attack. Plaintiffs allege that the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages resulting from the attack because they provided material support and assistance to Hamas, the terrorist organization that orchestrated the bombing. As such, defendants are subject to suit under the terrorist exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7).[1]

---

[1] The recently enacted National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, 122 Stat. 3, § 1083, revised the terrorism exception to sovereign immunity by repealing § 1605(a)(7) of Title 28 and replacing it with a separate section, § 1605A. Section 1605A creates a private, federal cause of action against a foreign state that is or was a state sponsor of terrorism, and provides for economic damages, solatium, pain and suffering, and punitive damages.

Plaintiffs mistakenly assert that § 1605A has automatic, retroactive application to any action previously brought under § 1605(a)(7) within the prescribed time limit. Rather, to benefit from § 1605A, a plaintiff in an action pending under § 1605(a)(7) must, within 60 days from the date of the NDAA's enactment, either (1) refile the action; or (2) file a motion for an order giving effect to the action as if it had originally been filed under § 1605A. *See* Section 1083(c)(2)(A) (setting forth the conditions upon which a pending action may be given effect as if originally

On March 14, 2006, plaintiffs filed their Complaint under the FSIA seeking redress for their losses. On November 14, 2006, this Court ordered service upon defendants through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4). On June 20, 2007, plaintiffs filed proof of service in compliance with statutory procedures and thereafter sought entry of default on October 12, 2007, based upon defendants' failure to respond or enter an appearance. Default was entered by the Clerk of this Court against both defendants Iran and MOIS on October 15, 2007.

Plaintiffs' liability and damages claims are supported by the evidence presented in the January 31, 2008 hearing on liability. Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiffs and against defendants Iran and MOIS.

## FINDINGS OF FACT

### I. Generally

1.    Plaintiff Harry Beer is an American citizen born and domiciled in Ohio. (*See* Hr'g Tr. 31, 64, Jan. 31, 2008.) He is the brother of Alan Beer and appears as a plaintiff in his own capacity and as administrator of his late brother's estate. (Compl. ¶ 1.)

2.    Decedent Alan Beer is an American citizen born on December 15, 1956, in Cleveland, Ohio. (*See* Hr'g Tr. 32, 35.) At the time of his death, he was domiciled in Ohio. (*See id.* at 38; Ex. 11.)

---

filed under § 1605A); section 1083(c)(2)(C) (providing the time limitations for plaintiffs to file a motion or refile an action under subparagraph (A)). Where, as here, plaintiffs in a case pending under § 1605(a)(7) fail to properly assert a cause of action under § 1605A within the 60-day limit, the court will retain jurisdiction under § 1605(a)(7). *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008) (holding that courts retain jurisdiction over cases pending pursuant to § 1605(a)(7) when Congress enacted the NDAA).

3. Plaintiff Anna Beer is the mother of decedent Alan Beer. She is a naturalized American citizen who was domiciled in Ohio at the time of her son's death. (*Id*. at 62, 64.)

4. Plaintiff Phyllis Maisel was born in Cleveland, Ohio. (*See id*. at 32.) She is an American citizen who was living in Israel at the time of her brother's death. (*See id.* at 83–84.) She was last domiciled in Ohio. (*See id*. at 32–33.)

5. Plaintiff Estelle Carroll was born in Cleveland, Ohio. (*See id*. at 32.) She is an American citizen who was domiciled in Norfolk, Virginia at the time of her brother's death. (*See id*. at 53.)

6. Alan Beer was the youngest of four children. He grew up in a close, religious family in Cleveland, Ohio. After graduating from high school, Alan began to visit Israel, where his older sister Phyllis Maisel resided. (*See id.* at 77.) Alan developed a career in information technology, working in various locations throughout the U.S. (*See id*. at 34–35.)

7. Alan traveled between the U.S. and Israel regularly. At one point, he resided in Israel for approximately fours years and then returned to the U.S. to pursue career opportunities and to be with his mother. (*See id.* at 83.) Alan worked in the U.S. for a short period, then returned to Israel for the final time six months prior to his death. (*See id*.)

8. Alan's family was well aware of the frequency of terrorist attacks in Israel. (*See id*. at 52, 65, 84–85.) Terrorist attacks were so frequent that Phyllis Maisel became the point of contact for all of the family members living in the U.S. to make sure that all family members in Israel were safe after an attack. (*See id*. at 42.)

II. **The June 11, 2003 Bombing**

9. On June 11, 2003, a Hamas suicide bomber blew up Egged bus number 14A. (*See* Clawson Dep. 35:10–36:20, May 24, 2006; *see also* U.S. Dep't of State, 2003 Patterns of Global

Terrorism, app. A at 12.) One of the deadliest attacks of the year, the explosion killed 17 people, including Alan Beer, and wounded more than 99. *See* 2003 Patterns of Global Terrorism, app. A at 12. Hamas claimed responsibility for the bombing as retaliation after the Israelis attempted assassination of a senior Hamas leader. (Clawson Dep. 36:4–10.)

### III.  Iranian Support and Sponsorship of the Attack

10.    Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Flatow v. Islamic Republic of Iran*, 999. F. Supp. 1, 9, ¶ 19 (D.D.C. 1998) (Lamberth, J.).

11.    Hamas is an organization supported by Iran, "dedicated to the waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 79, ¶ 10 (D.D.C. 2006) (Lamberth, J.) (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19, ¶ 24 (D.D.C. 2002) (Lamberth, J.)).

12.    Defendant Iran actively provided material support to Hamas at the time of the June 11, 2003 suicide bombing of Egged bus 14A. (Clawson Dep. 39:9–17.) Iran remained the most active state sponsor of terrorism in 2003. (2003 Patterns of Global Terrorism 88.) During that period, "Iran maintained a high-profile role in encouraging anti-Israeli activity" while providing Hamas and other terrorist organizations with funding, safe haven, training, and weapons. (*See id.*) Iran hosted a conference in August 2003 on the Palestinian *intifadah,* at which an Iranian official suggested that the continued success of the Palestinian resistance depended on suicide

operations. (*Id.*)

13.     Pesach Dov Maisel ("Dov Maisel"), the son of Plaintiff Phyllis Maisel and nephew of Alan Beer, began working for Israeli Emergency Medical Services ("EMS") at the age of fourteen. (Hr'g Tr. 13.)  He has responded to most of the terrorist attacks in greater Jerusalem since 2000. (*Id*. at 15.)  Dov Maisel was contacted on his beeper on June 11, 2003, to respond to a bus bombing. (*Id*. at 17.)  Upon arrival at the scene of the bombing, he was not aware that his uncle, Alan Beer, had been on the bus. (*Id*. at 20.)

14.     Dov Maisel described in detail the debriefing procedure undertaken by the medical personnel who responded to the scene of the June 11, 2003 bus bombing. (*Id.* at 22-24.)  During the debriefing, a doctor described one of the victims he treated at the scene.  According to the doctor, the man was conscious after the bombing but had extensive shrapnel wounds.  This man was conscious when the response team did the first survey of the victims, but he had suffered severe trauma and was experiencing shortness of breath.  By the time the medics brought him to the ambulances to be transported to the hospital, he was dead. (*Id.* at 24–25.)  The day after the bombing, pictures of those killed were in the papers.  The same doctor approached Dov Maisel at Alan Beers' funeral and told him that Alan was the victim in the doctor's description. (*Id*. at 24.)

### IV.     Family Members of Decedent Alan Beer

15.     Harry Beer was the first family member to learn of Alan Beer's death. (*Id*. at 42-44.)  A friend of Alan's, who was with him shortly before Alan boarded the Egged bus 14A, heard that a bus had been bombed and went to the scene to see if it was the same bus.  When he realized that Alan was killed in the bombing, he called Harry Beer to inform him of his brother's death. (*Id*. at 43.)  Harry Beer had the difficult task of calling his sister Phyllis Maisel, to give her the tragic

news that Alan had been killed. (*Id*. at 44.) Afterward, he and his wife drove to his mother's home to inform her that her youngest son was dead. (*Id*. at 44–45.)

16. Anna Beer had been watching CNN and saw coverage of the bus bombing. (*Id.* at 66–67.) While watching the CNN coverage, she thought to herself, "[O]h my God, these families. What a terrible tragedy." It was then that her son Harry Beer arrived and informed her that she "was part of the tragedy." (*Id.* at 67.)

17. Phyllis Maisel, who lived in Israel at the time, also saw coverage of the bus bombing on television. (*See id.* at 85.) The next morning she received a call from Harry Beer informing her that Alan had been on that bus and was dead. She became so emotional that she could not talk anymore and gave the phone to her husband. (*See id.* at 88–89). When her son, Dov Maisel, saw her the next day, she was totally broken down and crying. (*See id.* at 27).

18. Estelle Carroll was well aware of the frequency of terrorist attacks in Israel. Upon hearing of an attack, she usually waited for a phone call indicating that everyone in the family was safe. (*See id*. at 52.) After the June 11, 2003 attack, she received a visit from the community rabbi who informed her that Alan had been killed in the recent bus bombing in Israel. She called her brother, Harry Beer, and begged him to tell her it was not true. Upon receiving confirmation that Alan had been killed, she became emotionally upset and began ripping at her clothes. (*See id*. at 53–54.)

19. Harry Beer and his mother Anna Beer immediately flew to Israel for Alan's funeral. (*See id.* at 45.) Anna Beer was so exhausted from the trip and upset by the death of her son that she required the use of a wheelchair for the first time. (*See id*. at 54.)

20.     The entire family observed the Jewish period of mourning, sitting *shiva*, at Phyllis Maisel's house. Close to one thousand people came to the Maisel home. (*See id.* at 92.)

21.     Alan Beer was a volunteer in the community and was taking the bus home after having made a *shiva* visit to a friend whose father had died. (*See id.* at 42.) His family inscribed a Hebrew quotation on his gravestone which, when translated, says that "he is a person that is always happy to meet people and greet them with happiness when he meets anyone." (*See id.* at 29.)

22.     Harry Beer, Alan's older brother, recalled fond memories of their childhood. (*Id*. at 33) He described his brother as someone special who touched a lot of people. He recounted memories of his brother's relationship with his children who fondly called him "Uncle Dude." (*Id.* at 47.)

23.     Estelle Carroll, one of Alan's older sisters, thought of him as her first baby since she was old enough to take care of him when he was born and he was close enough in age to her own son that he became somewhat of a big brother to him. (*See id.* at 49.) She explained that nothing can fill the hole cause by Alan's death. (*See id.* at 51.)

24.     Phyllis Maisel is Alan's other older sister. She recalled that when Alan entered kindergarten at the same school she attended, she became responsible for getting him to and from school. (*See id.* at 75). Following Alan's death, she attended grief counseling for two-and-a-half years to help her cope with the loss. (*Id*. at 93–94.)

25.     Anna Beer, Alan's mother, described her son as "sunshine;" a "blessed child;" someone who was "always smiling." (*Id.* at 65.) Anna Beer inscribed the phrase, "He was a gift from God," on Alan's gravestone to signify the pleasant unexpectedness of learning that she was

pregnant with him after she no longer expected to have any more children. (*See id*. at 68.) She has saved many mementos of her son, including a picture Alan painted that now hangs prominently in the living room of her home. (*See id*. at 69–70; Ex. 10A–C.)

## CONCLUSIONS OF LAW

**I.      Legal Standard for FSIA Default Judgment**

Under the Foreign Sovereign Immunities Act, no judgment by default shall be entered by a court unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004). In FSIA default judgment proceedings, plaintiffs may establish proof by affidavit. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.). Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (Lamberth, J.) (citing *Campuzano*, 281 F. Supp. 2d at 268). This Court accepts the uncontested evidence and sworn testimony submitted by plaintiffs as true in light of defendants' failure to object or enter an appearance to contest the matters in this case.

**II.     Jurisdiction**

The Foreign Sovereign Immunities Act is the sole basis for jurisdiction over foreign sovereigns in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989). The "state-sponsored terrorism" exception provides that a foreign sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such

>act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under 28 U.S.C. § 1605(a)(7), plaintiffs must demonstrate that (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism;" (2) the victim or claimant was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser*, 466 F. Supp. 2d at 254.

Each of the requirements is met in this case. First, defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. 1, 11 (D.D.C. 1998) (Lamberth, J.). Second, each of the plaintiffs in this action was a United States national at the time the bombing occurred. Finally, as to the third element, defendant Iran knowingly provided material support to Hamas, the entity that committed the attack. As such, Iran's support of Hamas falls squarely within the ambit of the statute. Defendant MOIS is treated as the state of Iran itself rather than its agent, *Roeder*, 333 F.3d at 234, and thus the same determinations apply to its conduct.

The FSIA provides that personal jurisdiction over a non-immune foreign sovereign exists where service of process has been accomplished pursuant to 28 U.S.C. § 1608. *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). Since service has been effected and plaintiffs have established an exception to immunity pursuant to § 1605(a)(7), this Court has *in personam* jurisdiction over defendants Iran and MOIS.

### III. Liability

#### A. Proper Causes of Action Under the FSIA

Section 1605(a)(7) is "merely a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004). Once a foreign state's immunity has been lifted under § 1605 and jurisdiction is proper, § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law. *See Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8–10 (D.D.C. Mar. 29, 2005) (Bates, J.).

In this case, state law provides a basis for liability. First, the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *Id.* at *20.

This Court must next determine which state's law to apply. As the forum state, District of Columbia choice of law rules guide the Court's analysis. Under District of Columbia choice of law rules, courts employ a refined government interest analysis under which courts "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). This test typically leads to the application of the law of plaintiff's domicile,

as the state with the greatest interest in providing redress to its citizens. *See Dammarell*, 2005 WL 756090, at *20–21.

In the instant action, Estelle Carroll was domiciled in Virginia at the time of the attack, and the remaining plaintiffs were domiciled in Ohio. Accordingly, plaintiffs' claims shall be governed by Virginia and Ohio laws. As required by § 1606 of the FSIA, both states' laws provide a cause of action against private individuals for the kinds of acts alleged against defendants in this case. Therefore, this Court's next task is to determine whether plaintiffs have demonstrated defendants' liability and their right to damages under Ohio and Virginia law.

### B. Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to Hamas, which completed the June 11, 2003 attack. One may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement. This Court finds that civil conspiracy provides a basis of liability for defendants Iran and MOIS and accordingly declines to reach the issue of whether they might also be liable on the basis of aiding and abetting and/or inducement.

Civil conspiracy under Ohio law is the "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Heiser*, 466 F. Supp. 2d at 267 (quoting *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874 (S.D. Ohio 2002)).

Civil conspiracy under Virginia law "is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) (Lamberth, J.) (quoting *Hechler Chevrolet, Inc. v.*

*General Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985)). In Virginia, the basis for an action of civil conspiracy "is the wrong which is done under the conspiracy and which results in damage to the plaintiff." *Id.* (quoting *Gallop v. Sharp*, 19 S.E.2d 84, 86 (Va. 1942)).

As this Court has previously held, "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (Lamberth, J.) (quoting *Flatow*, 999 F. Supp. at 27). Here, it has been established by evidence satisfactory to this Court that Iran has continuously provided material support in the form of, *inter alia*, funding, training, and safe haven to Hamas and its members so that they may undertake terrorist attacks like the one in this action. It is undisputed that Alan Beer's death was caused by a willful and deliberate act of extrajudicial killing perpetrated by Hamas in furtherance of the terrorist jihad goals shared by Hamas and defendants. Finally, as will be discussed below, the plaintiffs in this action incurred damages resulting from the death and injuries caused by the conspiracy. Accordingly, the elements of civil conspiracy are established between Hamas and defendants Iran and MOIS.

### 1. Wrongful Death

Under Ohio's wrongful death statute, a civil action may be brought "in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, . . . [as well as] the other next of kin of the decedent." *Heiser*, 466 F. Supp. 2d at 337 (quoting Ohio Rev. Code. Ann. § 2125.02(A)(1)). A decedent's next of kin may include the decedent's siblings. *Id.* (quoting *Karr v. Sixt*, 67 N.E.2d 331, 335 (Ohio 1946)). Available compensatory damages for a wrongful death action include pecuniary damages, loss of support, services, society and prospective inheritance, as well as pain and

suffering incurred by the bereaved plaintiff. *Id.* The surviving spouse, children, and parents of the decedent, if any, are "rebuttably presumed to have suffered damages by reason of the wrongful death." *Id.* (quoting Ohio Rev. Code. Ann. § 2125.02(A)(1)). Alan Beer's estate is represented by his brother, Harry Beer. Alan's estate has asserted a claim under Ohio's wrongful death statute because he was last domiciled in Ohio. Under Ohio law, any recovery under this wrongful death action is for the benefit of his mother, Anna Beer, and his siblings, who have proven that they suffered damages resulting from Alan's death.

In light of the evidence presented, the estate of Alan Beer has made out a valid claim of wrongful death under Ohio law. As set forth above, defendants are vicariously liable for the suicide attack that took the lives of 17 innocent civilians, including Alan Beer.

### 2.     Conscious Pain and Suffering

Ohio law provides that an action for injury to the person or property of a deceased may be brought notwithstanding his death. *See* Ohio Rev. Code Ann. § 2305.21; *see also Monnin v. Fifth Third Bank of Miami Valley*, 658 N.E.2d 1140, 1149 (Ohio Ct. App. 1995). In order to maintain that claim, there must be some evidence of conscious pain and suffering by the decedent between the injury inflicted and his resulting death. *See Monnin*, 658 N.E.2d at 1149.

Based upon the evidence presented during the hearing, Alan Beer was alive and conscious following the June 11, 2003 blast. (*See* Hr'g Tr. 24.) Notwithstanding extensive shrapnel wounds, Alan survived long enough for the emergency personnel to identify him as one of the wounded and prepare to transport him to one of the many ambulances that later arrived at the scene. He expired only as he was being taken to the ambulance. (*See id.* at 24–25). In light of these facts, this Court finds that Alan Beer suffered conscious pain and suffering for a brief

13

period before his death. As such, plaintiff Harry Beer, acting as personal representative of Alan's estate, has established a valid claim against defendants for conscious pain and suffering.

### 3. Intentional Infliction of Emotional Distress

Ohio and Virginia recognize the existence of a cause of action for intentional infliction of emotional distress, rooted in Section 46 of the restatement (Second) of Torts. *See Pyle v. Pyle,* 463 N.E.2d. 98, 103 (Ohio Ct. App. 1983); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). While each state has its own particular means of describing intentional infliction of emotional distress, such a claim is established where plaintiffs demonstrate (1) that the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) that the plaintiff suffered severe or extreme emotional distress; and (3) that the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, at 42. The supreme courts of Ohio and Virginia have not specifically addressed, however, whether a plaintiff's presence is required to establish a viable IIED claim. Accordingly, "in light the severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly results from such a heinous act, and because a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families," this Court finds that claims for IIED may be brought by family members of terrorist attack victims without having to establish presence. *Id.* at 43–44 (quoting *Heiser*, 466 F. Supp. 2d at 328). Therefore, the Court finds that each of the plaintiffs has standing to recover for an IIED claim.

Based upon the evidence presented, the elements of plaintiffs' claim for intentional infliction of emotional distress are met. Defendants' conduct, in providing material support in a

civil conspiracy with Hamas to conduct suicide bombings, is extreme, outrageous and goes beyond all possible bounds of decency.  Further, it is abundantly clear to this Court that plaintiffs have suffered severe emotional distress as a result of Alan's tragic and untimely death.  Lastly, this Court finds that defendants' actions proximately caused the death of Alan Beer and the subsequent emotional distress experienced by his mother and siblings.  As such, this Court concludes that defendants Iran and MOIS are liable for intentional infliction of emotional distress under a theory of vicarious liability.

In light of the all of the evidence presented, this Court concludes that plaintiffs have "establishe[d] [their] claims or right to relief by evidence satisfactory to the court," and are therefore entitled to the entry of a default judgment against defendants.  28 U.S.C. § 1608(e); *see Roeder*, 333 F.3d at 232.

### IV.  Damages

#### A.  Compensatory Damages

As a result of the wrongful conduct of defendants Iran and MOIS, plaintiffs have suffered pain and mental anguish.  Under the FSIA, if a foreign state may be held liable, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Accordingly, a plaintiff is entitled to the typical bases of damages that may be awarded against tortfeasors under the laws under which his claim is brought.  As such, Anna Beer, Phyllis Maisel, and Harry Beer, in his personal capacity, and as personal representative of Alan's estate, are entitled to the typical array of damages that may be awarded against tortfeasors in Ohio.  Estelle Carroll is entitled to the typical array of damages that may be awarded against tortfeasors in Virginia.

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.). "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." *Id.*

### 1. Pain and Suffering Award for the Estate of Alan Beer

Harry Beer, as administrator of the Estate of Alan Beer is entitled to redress under two separate theories. First, the wrongful death claim is brought by the administrator of the estate on behalf of the bereaved plaintiffs for lost earnings and their own pain and suffering and loss of society. Second, the administrator of the estate is also entitled to damages for conscious pain and suffering prior to the decedent's death. As to the wrongful death claim, however, there is no evidence demonstrating that Alan's mother or any of his siblings relied upon Alan for financial support. Moreover, plaintiffs have presented no evidence of the present value of Alan's lost wages and earnings that he would have earned but for his untimely death. Under these circumstances, any recovery for Alan's wrongful death is limited to compensation for the mental suffering and loss of society sustained by his beneficiaries. As this Court has already concluded that Alan's mother and siblings are entitled to an award for intentional infliction of emotional distress, any additional recovery for pain and suffering pursuant to the wrongful death statute constitutes an impermissible double recovery. As such, this Court concludes that the recovery available to Alan's estate is limited to compensation for his conscious pain and suffering between his injury and death. This Court therefore finds that Harry Beer, acting as personal representative

Alan's estate, is entitled to $500,000 to be distributed in accordance with the Ohio laws of intestate distribution.[2]

### 2. Pain and Suffering Award for Alan's Relatives

This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims. *See Peterson*, 515 F. Supp. 2d at 51–52 n.25 (adopting the damages framework set forth in *Heiser*). This Court adopts that framework as a guideline for awarding damages in the instant matter.

Anna Beer has suffered great mental anguish as a result of the June 11, 2003 that killed her youngest son. Prior to this terrorist attack she was physically able to travel without physical assistance. Alan's death was so upsetting to her that she had to use a wheelchair to attend his funeral. Even today, every conversation she has with her children turns to Alan. (*See* Hr'g Tr. 102.) While this Court recognizes that there is nothing to compensate Anna Beer for Alan's death, it finds that she is entitled to $5 million for her ongoing pain and suffering.

Alan's siblings—Harry Beer, Estelle Carroll, and Phyllis Maisel—have also suffered emotional anguish and pain as a result of his untimely death. This Court recognizes their past and ongoing pain and suffering and will therefore award compensatory damages of $2.5 million for each sibling.

---

[2]    As Alan Beer died intestate (*see* Ex. 11), this Court's award for Alan's conscious pain and suffering shall be distributed in its entirety by Harry Beer, as personal representative of Alan's estate. *See* Ohio Rev. Code. Ann. § 2105.06(F).

17

B.     **Punitive Damages**

Until Congress passed the National Defense Authorization Act for Fiscal Year 2008, punitive damages were not available against foreign states. Under the newly enacted 28 U.S.C. § 1605A, punitive damages may be awarded. *See* 28 U.S.C. § 1605A(c). Plaintiffs, however, have not properly asserted a cause of action under § 1605A. To benefit from that section, plaintiffs must have either refiled this action or filed a motion for treatment under § 1605A pursuant to section 1083(c)(2), within 60 days from the NDAA's enactment. Plaintiffs have taken no such action here.[3] Accordingly, plaintiffs' claim for punitive damages must be denied.

## CONCLUSION

This Court acknowledges plaintiffs' ongoing pain and anguish that resulted from the heinous act of violence caused by defendants and the terrorists they support. Plaintiffs should be praised for the courage and resolve they demonstrated in pursuing this action. Their efforts are to be commended.

An Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, August 26, 2008.

---

[3]     *See supra,* note 1.